Good morning, your honors. I am Christina Hunt. I represented Mr. Norwood at the trial level, at the two trials that were held, and now here on appeal. I'm sorry, would you give me your name again? I think we haven't got it down here. We head you down as, well, actually, we head you down as Russell Smoot. You don't look like Russell Smoot. There's Russell Smoot. I apologize, Ms. Hunt. Our calendar is a little bit confused. Forgive me. Your name again is? Christina Hunt. Hunt. Okay. Thank you. And I represent not the governor, but Mr. Norwood. Very good. Thank you. Mr. Norwood is here complaining, essentially, of four different things which were raised in the brief. And the one that I would most like to discuss with the court is actually the question of whether or not the evidence was sufficient to sustain the conviction on the 924C count, which is whether or not there was sufficient evidence to show that this firearm was used in furtherance of the drug trafficking offense. I think the facts ---- That is a good point of adequacy. You're going to argue your strong point. Yes. I congratulate you. Thank you. And I'm very interested in that question. Thank you. Your Honors, I think that the evidence in this case was very straightforward. Mr. Norwood was in possession of approximately seven, a little more than seven grams of crack cocaine. That crack cocaine was found in his bedroom on a scale by his bed. Mr. Norwood was found in that room laying on top of the bed after having finished smoking a marijuana cigarette. Police officers came in. They smelled the marijuana. He was taken out of the room. He was questioned about it. A search then commenced, and they found some money on Mr. Norwood. They found money in his vehicle. They found an amount of marijuana that was in the closet. But the jury finding was that he had possessed this gun in furtherance of a drug trafficking offense that involved the crack cocaine, the 7.7 grams, not the marijuana. Was there any evidence of payo sheets, you know, the usual stuff that we see with drug dealers? No. There was absolutely none, Your Honor. There were no ---- And large amounts of cash and ---- The only thing they found, Mr. Norwood had approximately $2,500 in his pocket, and he had approximately, I think there was ---- $7,000. Another amount out in the car. $7,000 in the car. Correct. And $1,000 bonds. Correct. In the car, in the glove ---- in the seat compartment between the two seats, I believe, is where they found it. There was absolutely no evidence to establish that there was drug packing materials there other than the fact that the scales were found there. There was nothing to suggest that people had been in and out of the house to purchase drugs. There was nothing to suggest that the gun had ever been displayed to anyone. Was your theory at trial that he was just a user basically smoking marijuana? That is correct, Your Honor. In fact ---- What was his explanation for the scale? How did you deal with that? Your Honor, that he basically was a Costco consumer. In other words, he would purchase this crack cocaine and the marijuana in bulk, and he would weigh it because he didn't trust the drug dealers. In fact, expert testimony was from the government's own expert that that was reasonable. Costco? Pardon? I'm just kidding. That is a great argument, but the problem is that the jury found him guilty, right? Yes. Let's assume that the Costco scale argument was not a winning argument. It must not have been, Judge. All right. But it was a user event. And the actual ---- I don't mean to make fun of it. Right. What I'm really getting at is, you know, we struggle in our jurisprudence, and I know you're very familiar with it, in trying to figure out how much evidence is enough. Right. And how much we leave to the common sense of the jury in weighing all these facts and deciding, A, was Mr. Norwood dealing drugs? And if so, was the gun that was found right underneath him where he was sleeping when the police arrived, was it used in furtherance of the drug-dealing enterprise? Correct. I guess what would be helpful to me is, given the proximity of the weapon to your client, the drugs, the scale, and the money, isn't that good enough under some of our Ninth Circuit cases to make it a jury question, so that we can't declare as a matter of law that it's insufficient to support a conviction for use in furtherance? Except that this is the problem, Your Honor. I think that when we look at the cases, we also see that the Ninth Circuit has very clearly said that just because you have proximity, that doesn't mean there's enough. So we have to look and see what is the nexus to this gun other than proximity. So what do we know other than the fact of where it was found, which was actually between the mattress and the box screen? It wasn't as if it was readily accessible. He was laying on top of it. Well, yeah, but as I'm looking at that picture, let's see, what was it, Government Exhibit 3 and 4? Yes. It looked to me like if it was between the mattress and the box springs, all he needed to do while he's laying on the bed is just reach down underneath it and pull the gun out from under it. That's pretty excessive. Except that it's between the mattress and the box springs. So I think common sense tells us that if you're laying on the bed to reach under there, you have a problem because you're holding it down. Well, but that – And the other problem – The jury would then have to decide, based on their own reason and experience, whether or not it's any harder to get a gun out from between the mattresses as it would be if he had a pillow that I assume he was sleeping on. But the other thing I think, Your Honor, is just because it's there doesn't mean it's being used in furtherance of the drug offense. So let's say he was dealing. It seems, at least from the evidence at trial, that the government's contention, based on the fact that they didn't have any evidence of people coming in and out of the house, they didn't have – even though there were actually other people living in the house. They didn't have any evidence to show that Mr. Norwood's fingerprints were on the gun. They didn't have any evidence, any surveillance to show – Other than he lived at the house, right? Other than he lived at the house. And they also showed that Mr. Norwood had left the house at some point during that day and then come back, and then made a point of arguing that the money that was found in the car was found there because that's where his business was located, was in the car. Yeah, but which business? Right? If we assume that he was dealing the drugs. Right. I mean, the business might very well have been drug dealing, and it's not uncommon in our experience for drug dealers to deal out of cars. Correct. But if he's dealing out of the car and the gun is in the house, how is it being used in furtherance of? Well, that's where the scale and the drugs found in the bedroom caused the problem. And that's where he was. Yeah. And that's where he was. That's true, Your Honor. He also contended, quite frankly at trial, that he was a consumer of the crack cocaine, that he consumed it while it was rolled in the, we called them blunts, which are just very thick marijuana cigarettes. And the government's own expert conceded that that was one way to consume the crack cocaine. The Krause case suggests that there must be a substantial quantity of drugs involved and that there be a nexus to the gun in connection with the distribution of that drug. Right. How much crack cocaine, how much cocaine was actually located in the house? 7.7 grams, which is approximately a fourth of an ounce, which is approximately two 8-balls, which the DEA agent said was a user amount, an 8-ball. Okay. So do you think that for purposes of our analysis, that the fact that the quantity of drugs was relatively small, commensurate with user activity as opposed to sales activity, the fact that the gun was stuck in between the box spring and the mattress, that that meets the Krause test that you don't think we actually even get to a jury question here. It's just insufficient evidence to make the nexus. I agree, Your Honor. Why couldn't the jury conclude that his inventory was low because his cash was high? They have to base that strictly, really, on speculation that that's how that works. Isn't that circumstantial evidence? I mean, if he's got a total of, what was it, $9,500 in cash between the car and the bedroom, wouldn't that be consistent with the fact that he'd sold most of the drugs that he had and it just so happened that when the police arrived, he was down to two 8-balls? But he'll make you a good deal on those two 8-balls. I think, you know, that really goes to the other part of this appeal, which is the government being permitted to use the certificate saying that they had no proof that he was working to show that his income must have been illegal, as opposed to the fact that there was positive evidence shown by the defense that Mr. Norwood was quite frequently a gambler and quite successful at gambling and, in fact, had done work basically under the table without paying taxes. Why doesn't our decision in Cervantes Flores answer the admissibility of the affidavit that the employment security witness offered? Here is where I see that as being different. As opposed to looking at an immigration record, which is what Cervantes Flores is about, about an immigration record or about a diligent search of business records and I can't find anything? I suppose that is which way you look at the coin. Right. So I prefer not to look at the coin that way, Judge. So we're going to limit it to only the immigration. Sure. Okay. I'm with you. If we do that, if we look at it that way, the problem that I have is to say Mr. Norwood and to allow the government to argue Mr. Norwood doesn't work and thus he must be a drug dealer, when, in fact, that record shows only that the State Department, the Washington Department, has no record that he's worked. It also doesn't show that there are other legal ways to have income and that there are ways that people have income that are not reflected in that record. This was also a case that occurred in Spokane. So they didn't search the Idaho records to see if he'd worked in Idaho to submit that. He didn't testify, did he? No, he did not. Okay. Yes, I'm unfortunate. So there wasn't any evidence before the jury that he worked in Idaho? Not that he had worked in Idaho, but, yes, that he had worked under the table and at other locations. Okay. It seems to me the big issue here with the Crouse matter, again, is the fact that you've got that scale. If you just add the two eight balls and the gun, your argument might have a little more persuasion, but despite the Costco argument, I'm having trouble with the scale. Can you help me with that? Well, Your Honor, the problem is that to say that the scale alone is evidence of drug trafficking. The problem is it's in the aggregate. You have to take the room as you find it. As Judge Tallman indicates, you've got a lot of cash, suggestive of perhaps some recent deals. Maybe he's low on his stash. But he's got this. There's no other reason to have that scale in there other than in connection with selling the drugs, at least in the context of this case. You've got the drugs. You've got the gun. I'm having real trouble with your argument here because of the scale. Well, I think when we look at really the traditional purpose for why does someone have a gun in connection with drug dealing? So they would have it to embolden themselves or to protect themselves or to protect their stash. The fact that or to protect the cash, which most of the cash was found in the car, Your Honor, not on his person. Although he did have a ‑‑ I mean, I concede he had a substantial amount on his person. But if we look at all the other indicators that he must have been a drug dealer, the only thing we have is only the scale. We don't have packaging. We don't have customers. We don't have surveillance. We don't have anything other than the scale. But one could argue he's just not a very sophisticated drug dealer. Well, if the government wanted to argue that, they could have. But in fact, not only do they not argue that, but really their argument is counter to that, saying he's quite a successful drug dealer because he has almost $10,000. So it goes both ways. Your Honor, I have about a minute and a half. Can I say that? I do. Okay. Thank you. Thank you very much. Thank you, Your Honors. May it please the Court. My name is Russ Smoot, as the Court knows. And I am representing the government rather than the defendant in this matter. We're really glad to hear you're not. Joe Bolton. Well, I am here on behalf of Ms. Bolton, who was the trial attorney as well as the attorney on the brief and just couldn't be scheduled into oral argument today. I'd just indicate to the Court, I guess right up, that I've reviewed the filed briefs and everything submitted and would, I guess, offer it out to the Court if there's any specific questions or directions that the Court would like me to go first. Well, why don't you address the issue that Ms. Hunt started with on the evidence with regard to the use and furtherance? Okay. Your Honor, I think clearly in situations like this, I think the Court correctly notes that it's a jury decision or a fact. It's a factual issue that goes to the jury, and the standard being that would any rational jury find this or not find this? And the fact of the matter is that we can take whatever evidence that was presented or whatever inferences from that, and we can come to a different conclusion. For example, we could say the scale could be the scale of a dealer, could be the scale of a user. We could say that the excessive cash could be cash from perhaps drug sales or it could be cash from cashing in a retirement account or saving or whatever. The fact that things were maybe packaging material wasn't submitted and there's no record of packaging material necessarily being found or presented to the Court doesn't take away from the fact that I believe that the drugs that were found was packaged in individual separate packages. Again, it goes to the jury. Now, the jury clearly ---- What was the packaging? I believe, Your Honor, that it was packaged that from my reading of the record was that it was packaged individually in some type of cellophane, I believe. I do recall reviewing where it said it was packaged separately. There were some found in the defendant's coin pocket of his or a coin or watch pocket of his pants as well as some found on the scale. The bottom line is that we come before the Court with these issues on review that the jury has determined, and we're not much different than many cases that come before the Ninth Circuit to where there's a fact or analysis. And the Ninth Circuit has often said that, well, one factor here, one factor there, that doesn't necessarily make the case, but when the factors are all added together. For example, I think probably the most, I guess that the ---- I don't want to say significant, but one of the things that comes to mind outside of these factors is border-type search stops where there's been a lot of jurisprudence over how to evaluate and how to weigh each factor. Do you take them separately and say, all right, we discount this factor and say a scale can be used for any number of reasons? It could be used for measuring food. It could be used for any innocuous reason. But yet when you put those together and present them to the jury, the jury looks at it with reason and common sense and says, well, we believe that all of these factors put together and all of these items and all this evidence presented leads us to believe beyond reasonable doubt that these items combined that the defendant possessed with intent to distribute a controlled substance, that being the crack cocaine. Interestingly enough, the special jury verdict found, answered no to the use of the gun with respect to marijuana distribution. So it focused in on what was in the room and the proximity of the gun. Yes, Your Honor. And I would ‑‑ I guess I would follow up on that in that a lot has been ‑‑ something has been made, I guess, within the argument, within the briefs, concerning the fact that, well, there was no evidence of the defendant trafficking or distributing drugs anywhere away either in the house or away from the house. But that was not the drug trafficking offense that the defendant was found guilty of. What he was found guilty of was possession with intent to distribute, and that is a drug trafficking offense. The evidence of that offense was located within the proximity and location of the firearm. So it's not a matter of having to prove that the defendant took the firearm with him or had it with him in some speculative nature that he distributed drugs away from the house. The fact of the matter is that if the drugs were in the house, if they were being weighed out in the house, they were actually possessed in the house with the intent to distribute, as the jury found, based on everything, then that's where the gun was located seemingly approximately just a few feet from the evidence of the crime he was found guilty of. I assume that the jury heard testimony from a DEA agent or a similar expert that eight balls are a distributable quantity and that they're frequently sold on the street in those quantities. Yes. Yes, Your Honor. A DEA agent or task force officer, Taylor's testimony, he was qualified as an expert and indicated, in fact, that eight ball amounts can be used amounts, I believe, but also indicated from my recollection of reviewing his testimony that crack cocaine is also distributable in rock sizes, which are much smaller, in fact, can be, I think he used the term an eighth of a gram, that they're almost a spec size, and I believe that the record reflects that he even gave prices that those would typically sell for $20. So the fact of the matter is that, again, another factor borne out in testimony that, yes, eighth of an ounce, an eight ball, which remember there wasn't just an eight ball there, there was the equivalent of two or a quarter ounce of cocaine, could be considered user amounts, but also smaller amounts are often, in his training and experience, are distributed at obviously smaller amounts of money. So when we look at the sufficiency of the evidence, it's not so much just the fact that these items were found in this location, but we also factor in the expert testimony. The case law would often say that, well, you can't rely just on this, you can't rely just on that. Some of the 924C case law will say, well, you can't just rely on testimony that says, based on an expert opinion, drug dealers carry guns, and that's not what we have here. We have that type of evidence, but we also have the evidence that Rios discussed in being the proximity and location to the offense, this being a possession with intent to distribute. Anybody have anything further for Mr. Smoot? I think not, unless you have any final words you'd like to leave us with. Okay. Unless the Court, again, wants to take any comments or any questions concerning the other issues, then I'll take my leave. We appreciate counsel who declined to bobeate. But in all fairness to Ms. Hunt, she's got the final words. Thank you, Your Honor. Your Honor, I'll take just a few moments to say, I think when we look at this case in a whole, in terms of whether or not there was evidence to show that that firearm was used in furtherance of the drug trafficking offense, all we have is that it was close to what may have been there, but not necessarily any positive evidence to show it was used in furtherance of that offense. We run into this problem in all cases where guns are found in locations from which there may be drug dealing. I mean, you've got the Mosley case where there were guns that were basically strategically placed throughout the apartment, but Mr. Mosley wasn't there when the search warrant was executed because he'd been arrested outside at an accident scene. And, you know, that's a jury question, isn't it? First they had to decide, was Mr. Norwood a drug dealer? And if the answer to that question is yes, then was the presence of this firearm where it was found? And as Mr. Smoot points out, in consideration of all the totality of the evidence, did it suggest that the weapon was being used to further the business activity of drug dealing? But I don't think that that's what the elements are. The elements are that he possessed this firearm, so did he possess it? And was it possessed in connection with and in furtherance of the drug trafficking offense? Mosley said yes, that with the presence of sufficient items of evidence that a jury could so find, even though the gun was just sitting there. But also, I guess the problem that I have with that is we have, unlike Mosley, we have one firearm under a mattress, not strategically located, was the argument in Mosley. The problem, I guess you and I see differently the significance of the gun tucked under the mattress. Correct. And it seems to me that a reasonable jury could find, given the proximity of the firearm to the scale and the cocaine, in the bedroom that it was placed under the mattress because it was strategically located in case somebody broke into his bedroom in the middle of the night trying to take his money or his drugs from him. I understand the Court's position. I don't agree with it, but I understand it. Can I just ask one final question here? Certainly. Your opposing counsel indicated that the two 8-balls are more than enough evidence, are more than enough quantity of drugs to be commercially viable, saleable units. Do you agree with that? That 8-balls? Well, one can both purchase 8-balls for use and one can also sell 8-balls in that quantity. I think it suggested that this relatively small quantity was for use. Correct. But I guess the point is he's saying that they could just as equally be used for sale. Do you agree with that? That amount? That amount. I would have to agree that that's true. Okay. Okay. It has nothing to do with our decision in this case, but as one person, I really am not, I don't understand so many 15-year-long prison systems of punishment without benefit of parole. And I don't, I think it's a rare case where that serves society. I suppose you'll follow the new, your client will follow the, one you are so well defending will follow the new procedure and see if the district judge wants to change the sentence. Yes, Your Honor, we will be following that procedure once the appeals are done. Okay. Well, thank you both. The case was very well argued. I appreciate your honesty.
judges: Tallman, Smith, Reavley